IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CHARLES M. HAYES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | Civil Action No.: 1:05CV01018 |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Charles M. Hayes, brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Social Security Act (the "Act"). The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

---

[1] Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he should be substituted for Jo Anne Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Procedural History**

Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on August 11, 2000 , alleging a disability onset date of September 6, 1999.  Tr. 98, 557.  The applications were denied initially and upon reconsideration.  Tr. 23, 24; 559, 560.  Plaintiff requested a hearing de novo before an Administrative Law Judge (ALJ).  Tr. 50.

The ALJ did not find that Plaintiff was disabled for purposes of Act, Tr. 28, and Plaintiff requested review of that decision, Tr. 62.  The Appeals Council vacated the ALJ's decision and remanded Plaintiff's case for reconsideration.  Tr. 78.  The ALJ conducted a second hearing on February 24, 2005, attended by Plaintiff, his attorney, his witness, and a vocational expert.  Tr. 613.  By decision dated June 7, 2005, the ALJ again determined that Plaintiff was not disabled.  Tr. 15.  On October 21, 2005, the Appeals Council denied Plaintiff's request for review, Tr. 7, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2

3.    The claimant's arthritis; status-post cervical spine fusion in 1993; hypertension; diabetes; sleep apnea; and right shoulder pain are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the following residual functional capacity:  lift and/or carry up to ten pounds frequently and 20 pounds occasionally. He can sit, stand and/or walk for up to six hours each in an eight-hour workday.

7.    The claimant's past relevant work as [a] parking attendant did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8.    The claimant's medically determinable arthritis; status-post cervical spine fusion in 1993; hypertension; diabetes; sleep apnea; and right shoulder pain do not prevent the claimant from performing his past relevant work as a parking attendant.

9.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).

Tr. 20-21.

## Analysis

In his brief before the court, Plaintiff argues that the Commissioner's findings are in error because the ALJ failed to consider:  (1) the effects of his obesity and his sleep apnea upon his residual functional capacity (RFC); (2) the RFC assessment

of a state agency expert; and (3) the disability finding of the Department of Veterans Affairs ("DVA").  The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

Scope of Review

The Act provides that, for "eligible"[2] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).[3]

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration ("SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's listing of impairments, (4) has an impairment which prevents past relevant work, and

---

[2]    Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C. § 1382(a).

[3]    The regulations applying these sections are contained in different parts of the Code of Federal Regulations (C.F.R.).  Part 404 applies to federal old-age, survivors, and disability insurance, and Part 416 applies to supplemental security income for the aged, blind, and disabled.  Since the relevant portions of the two sets of regulations are identical, the citations in this report will be limited to those found in Part 404.

4

(5) has an impairment which prevents him from doing any other work. 20 C.F.R. § 404.1520.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

5

Pertinent Evidence Presented

As of the date of the ALJ's decision, Plaintiff was fifty-nine years of age. Tr. 16. The ALJ found that he has a seventh grade education and past relevant work as a laborer, a supervisor, safety and health personnel, and a parking attendant. According to the ALJ, Plaintiff initially alleged disability due to arthritis, hypertension, and other health problems.

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability (AOD). He also determined that Plaintiff meets the disability insured status requirements of the Act.[4] Further, the ALJ found the medical evidence to establish that Plaintiff suffered from the severe impairments of arthritis, status-post cervical spine fusion, hypertension, diabetes, sleep apnea, and right shoulder pain. He concluded, nevertheless, that none of these impairments met or equaled any of the Listing of Impairments.

1. RFC

Social Security Ruling (SSR) 02-1p provides guidance on the evaluation of obesity in disability claims. See 67 Fed. Reg. 57859-02, 57859. As with any impairment, the factfinder will consider both whether obesity is a severe impairment, and whether it causes any limitations.

---

[4] Although the ALJ found that Plaintiff was insured for DIB through the date of his decision, Tr. 16, the record otherwise indicates that Plaintiff was insured only through March 2002, see Tr. 29, 136, 617.

6

Plaintiff argues that the ALJ failed to comply with Ruling 02-1p in that he failed to mention obesity, but the records provided the ALJ with little to discuss. Plaintiff failed to allege obesity in either of his two Disability Reports, see Tr. 141, 160, or to attribute any of his alleged limitations to obesity.

During the relevant period, Plaintiff sought healthcare at Veterans Administration Medical Center ("VAMC") facilities. At an appointment in July 1998 – over a year prior to his AOD – Plaintiff was already obese, with a body mass index of 36.3.[5] See Tr. 439. This visit, for lower extremity swelling, was not connected to Plaintiff's obesity, and he apparently continued to work through to his AOD. See Tr. 142, 169.

Plaintiff returned for follow-up in October 1998. See Tr. 430. He had no leg swelling, and admitted to recent weight gain after quitting smoking. The caregiver advised him to elevate his feet, use pressure hose, go on a low-salt diet, and exercise daily.

When Plaintiff visited the VAMC in May 1999, he was described as obese, but no medical problems were linked to the description. See Tr. 425. Plaintiff claims to have been disabled from working the following September, yet he sought only minimal medical care during the period spanning December 1998 through April 2000.

---

[5] The Center for Disease Control and Prevention provides that a body mass index over 30 qualifies an individual as obese. See http://www.nhlbi.nih.gov/guidelines/obesity/bmi_tbl.pdf (last visited March 1, 2007).

Plaintiff's medical visits from April through November 2000 were associated primarily with kidney stones. See Tr. 228, 260, 263-68, 358-423. In April, diet and exercise were among the topics discussed with him. Tr. 422. In May, "overweight" was listed as a "CHD risk factor." Tr. 420. In July, the caregiver only observed that he was obese. Tr. 415. In August, obesity was listed, along with Plaintiff's age range, as a thrombosis risk factor with regard to Plaintiff's stent surgery. Tr. 413. At Plaintiff's appointment on October 30, 2000, he complained of pain associated with his kidney issues, but was otherwise "doing well," with no complaints of chest pain, shortness of breath, or gastrointestinal symptoms. Tr. 260.

Despite Plaintiff's minimal health care, in December 2000, he presented the consultative examiner with a laundry-list of complaints. See Tr. 229. The examiner associated none of them with Plaintiff's obesity, and failed even to remark thereon. See Tr. 231. A state expert, in assessing Plaintiff's RFC, noted his obesity, yet still found him capable of medium[6] work, with no postural limitations. See Tr. 459-60.

After having a urinary tract stent removal in November 2000, Plaintiff did not have another medical visit until March 2001, when he complained of subjective swelling and pain. See Tr. 258. The caregiver mentioned his obesity, yet did not connect it to Plaintiff's complaints.

---

[6] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

8

Plaintiff had a second appointment on the next day, when complaints of chest pain were evaluated. See Tr. 256. At his cardiology consult, he reported a fifty-pound weight gain in three years,[7] Tr. 251, but again, no connection was made between the symptom and the weight. Despite his complaints, Plaintiff claimed that he exerted himself around the house and could walk for five to six miles without problems. Tr. 248. Because of his chest pain, Plaintiff underwent a stress test, on which he was able to reach his target heart rate without discomfort. See Tr. 245.

Plaintiff returned for a follow-up visit on May 30, 2001. The record notes that he continued to gain weight, Tr. 239, but was engaging in light to moderate exercise thirty minutes per day, Tr. 241. His diagnoses were hypotestosteronism, chronic neck pain, non-cardiac chest pain (possibly due to stress or fatigue), and possible sleep apnea. Tr. 243. There was no discussion of his obesity.

Plaintiff underwent a second consultative examination on August 28, 2001. Although his obesity was again noted, see Tr. 443-44, it was not linked to his diagnosis of degenerative joint disease, which was postulated to be limiting Plaintiff's physical capability, Tr. 444. A state expert assessing Plaintiff's RFC also mentioned Plaintiff's obesity, but still found that he could perform light[8] work. See Tr. 451-52. Although this expert suggested postural limitations, he based them on an x-ray

---

[7]    This report is not supported by Plaintiff's medical records, which state a weight of 232 pounds in July 1998, Tr. 439, and of 266 in March 2001, Tr. 326. In May 2001, Plaintiff told a caregiver he had gained 40 pounds in the previous year, yet he weighed only 272 pounds, Tr. 240, and 253 pounds in May 2000, Tr. 420.

[8]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

showing minor degenerative changes in Plaintiff's lumbar spine, and a minimal decrease in back ranges of motion.  <u>See</u> Tr. 452; <u>see also</u> Tr. 446, 448.

At a rheumatology visit the following day, it was noted that Plaintiff exercised regularly.  Tr. 299.  In October 2001, Plaintiff had his annual checkup, at which he had no physical complaints beyond pain in his right shoulder and left knee within the last several weeks.  Tr. 292-93.  Thereafter, the transcript contains records of no doctors' appointments through December 2003, when Plaintiff experienced upper respiratory symptoms.  <u>See</u> Tr. 523.

Plaintiff returned to the VAMC on January 9, 2004, for evaluation of a cough.  <u>See</u> Tr. 490.  He claimed to be exercising.  Tr. 491.  The caregiver observed that Plaintiff was "heavyset," yet ambulated well and had normal range of motion and full strength in his four extremities.  Tr. 493-94.  His diabetes and hyperlipidemia were controlled with medication, and a new blood pressure prescription was added.  Tr. 494.  As to Plaintiff's obesity, the caregiver only made him aware of the importance of diet and exercise.

Plaintiff had cataract surgery in April 2004, Tr. 498, and an occurrence of gallstones in May and June, Tr. 522-23, 528-29, 548, but no evidence of further health issues until a complaint of fatigue in August, Tr. 500.  He was having no problems with blood glucose or hypertension, no chest pain or swelling or shortness of breath.  Tr. 501.  The caregiver again described Plaintiff as heavyset, and again noted that he ambulated well, with normal range of motion and full strength in his

10

four extremities. Tr. 502. He ascribed Plaintiff's fatigue to either worries about finances and childcare or to sleep apnea. As to his obesity, Plaintiff again received education about diet and exercise, in addition to other lifestyle modifications. This instruction was repeated in October at the VAMC's Pulmonary Clinic, where Plaintiff received treatment for sleep apnea. <u>See</u> Tr. 504. Plaintiff's last record visit, on December 10, 2004, was a follow-up of renal calculi; there is no mention of his obesity. Tr. 526.

Significantly, throughout Plaintiff's medical history, no caregiver suggested any medical treatment for his obesity. Of note, the DVA decision awarding Plaintiff disability benefits fails to list obesity among his impairments. <u>See</u> Tr. 119. The ALJ noted Plaintiff's testimony that he was sixty-seven inches tall and weighed 260 pounds. Tr. 18. His observation only that Plaintiff "could undoubtedly enjoy better health if he were to lose some weight," Tr. 19, demonstrates both that he considered Plaintiff's obesity, and that the medical records do not support a finding that Plaintiff is significantly affected by this impairment. The court refuses to find reversible error when Plaintiff has failed to show his obesity in fact caused any limitations. <u>Cf.</u> <u>Pass v. Chater</u>, 65 F.3d 1200, 1203 (4th Cir. 1995) (claimant bears the burden of proof and production through step 4 of the sequential evaluation); 20 C.F.R. § 404.1512(a) ("you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and ... its effect on your ability to work on a sustained basis").

Plaintiff argues that the ALJ likewise failed to consider the impact of his sleep apnea upon his RFC but, again, there is little evidence that Plaintiff's sleep apnea impacted his RFC. His records contain no sleep complaints until he was evaluated for chest pain in March 2001. See Tr. 248. Because of his "body habitus" and sleep apnea symptoms, Plaintiff was referred to the sleep clinic. Tr. 253. The VAMC Rheumatology Clinic suggested that sleep apnea might be a component of his arthralgias, and requested a sleep study. Tr. 327.

Plaintiff went to the Pulmonary Clinic for a consultation on May 30, 2001. Tr. 321. He reported that he was tired during the day and took two one-hour naps daily, but still felt tired. Yet he failed to mention any sleep-related complaints to the consultative examiner in August 2001, and the examiner did not include the issue in his report. See Tr. 444. Plaintiff again complained of pain, on the very next day, but the caregiver made no note of sleep apnea. See Tr. 299-302. In October, Plaintiff's only complaint was of pain in his right shoulder and left knee. See Tr. 292-93.

After undergoing a sleep study on July 11, 2002, Plaintiff received a diagnosis of moderately severe mixed sleep apnea. See Tr. 472. But throughout the rest of 2002, and through 2003, the record contains no complaints of fatigue, myalgias, or sleep apnea. Plaintiff visited VAMC's Pulmonary Sleep Apnea Clinic on January 8, 2004, to pick up a "nasal aire with a chin strap." Tr. 490. At his annual checkup the following day, he complained only of a cough. See id. On January 12 and 22,

Plaintiff spoke with the Pulmonary Sleep Apnea Clinic about his CPAP[9] unit. Tr. 495. He brought the unit to the Clinic on February 4 for the Auto-adjust to be downloaded, and received an "Adam circuit with large pillows." Id.

Not until August 6, 2004, did Plaintiff seek help for a fatigue complaint, and the caregiver did not know whether it was caused by his sleep apnea, or by his concerns about financial and childcare issues. Tr. 501-02. He was referred to the sleep clinic for a check of his CPAP unit. Tr. 502.

Plaintiff saw Dr. Srinivas Bhadriraju at the Pulmonary Sleep Apnea Clinic on October 4, 2004, complaining of continuing difficulty with using his CPAP unit. See Tr. 505. He reported that he had used the unit for only three months since December 2003. Yet, when using it, Plaintiff "noticed remarkable improvement in his symptoms of snoring and excessive day time sleepiness." Id. In his assessment, Dr. Bhadriraju wrote that Plaintiff was "well motivated" and wanted to resume using the unit. Id. The doctor counseled Plaintiff, and reinforced to him the importance of using the unit on a regular basis. There is no other mention of sleep apnea or related complaints in the medical records.

---

[9] An abbreviation of "continuous positive airway pressure," CPAP is "a technique of respiratory therapy, in either spontaneously breathing or mechanically ventilated patients, in which airway pressure is maintained above atmospheric pressure throughout the respiratory cycle by pressurization of the ventilatory circuit." Stedmans Medical Dictionary 421, 1442 (27th ed. 2000).

The ALJ discussed the sleep test and resulting diagnosis, Tr. 17, and determined that Plaintiff's sleep apnea was a "severe"[10] impairment, Tr. 18. He noted the testimony that Plaintiff has sleep apnea and must nap during the day, although this sleepiness was attributed to Plaintiff's medications. Id.; see also Tr. 633. Plaintiff had also testified that he has a CPAP machine and had used it for the previous year and a half. Tr. 19; see also Tr. 639.

The ALJ noted, however, that Plaintiff's sleep apnea appeared to have responded to CPAP, "since he has continued to use the machine for more than one and one-half years." Tr. 19. And the ALJ's conclusion is justified, as Plaintiff reported that, with the machine's use, he had "remarkable improvement" in his daytime sleepiness. Thus, contrary to Plaintiff's argument, the ALJ duly considered his sleep apnea and, as demonstrated by the above discussion, the medical records contain ample support for his finding that it does not prevent Plaintiff's engaging in light work.[11]

---

[10]   An impairment is deemed severe only if it significantly limits a claimant's physical or mental abilities to perform "basic work activities." See 20 C.F.R. § 404.1520(c).

[11]   Plaintiff contends the ALJ cites no evidence to support his conclusion that his "sleep apnea results in no limiting effects." Pl.'s Br. at 4. Yet Plaintiff has cited to no evidence that his sleep apnea *does* result in "limiting effects," and the burden of proof is his to carry at this point. See, e.g., Pass, 65 F.3d at 1203.

14

2.  State Expert Opinions

Social Security Ruling 96-6p, 61 Fed. Reg. 34466-01, clarifies SSA's policy regarding the consideration of findings of fact by State agency medical and psychological consultants.  Id. at 34467.  It explains that these consultants "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  Id.  In disability cases, they consider the medical evidence and make findings of fact on the medical issues, including the claimant's RFC.

Paragraph (f) of 20 C.F.R. Section 404.1527 provides that findings of fact by these consultants become "opinions" at the ALJ and Appeals Council levels of administrative review.  SSA requires that, because the consultants are experts in its disability programs, the ALJ and Appeals Council consider and evaluate these opinions in making a decision.  Although not bound by the opinions, these adjudicators are admonished that "they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  SSR 96-6p, 61 Fed. Reg. at 34467.

Plaintiff points particularly to the assessment of an expert dated September 19, 2001, who opined that Plaintiff's overhead reaching, and handling and fingering with the right hand, be limited to only "occasionally."[12]   Tr. 453.

---

[12]  "'Occasionally' means occurring from very little up to one-third of the time." SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. 24, 29 (West 1992).

15

Plaintiff contends the ALJ found that he could perform the full range of light work and failed to explain the conflict between this RFC and that of the expert.

But Plaintiff is mistaken – the ALJ *did* explore this conflict. He first included in his RFC finding that Plaintiff could "frequently[13] reach, finger and handle objects." Tr. 19 (footnote added). He explained that Plaintiff's arthritis, "except during period[s] of relatively minor exacerbation, has not required extensive medication or pain medication." Id. The expert had relied, in part, on a notation that Plaintiff's hand grip was "somewhat diminished." Tr. 453; see also Tr. 443. But the ALJ observed, "There is no showing of arthritic effects on the claimant's hands, other than a couple of periods when there were exacerbations of the condition for short times." Tr. 19. He concluded: "There is no evidence that the claimant lacks the ability to perform normal fingering and maneuvering functions, with his hands and arms." Id.

Again, the ALJ's assessment is duly supported. Plaintiff's records contain no upper extremity complaints through the December 2000 consultative examination by Dr. Stanley Wallace. The doctor's findings included a *mild* weakness in the right upper extremity and a reduced range of motion of the right shoulder. Tr. 230. He observed that Plaintiff had a moderate decrease in grip with his full fist, but normal digital dexterity and callouses on both hands. Tr. 231. Dr. Wallace noted that,

_____

[13] "'Frequent' means occurring from one-third to two-thirds of the time." SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. at 29.

although there was some loss of grip, Plaintiff had no difficulty making a full fist, and the use of his hands might be restricted only for "heavy" work.[14]  This examining physician failed to advise the limitations suggested by the non-examining expert.

Not until the following February do the medical records contain a complaint of pain in Plaintiff's right shoulder, made via a telephone call to VAMC.  See Tr. 260. He called again on March 8, 2001, complaining of pain "all over," including constant pain in his right upper extremity for two weeks, and some numbness in his upper arm.  Tr. 259.  Upon a visit to the Rheumatology Clinic on March 20, he complained of widespread pain, most severe in his right hand.  Tr. 258.  The caregiver observed good range of motion throughout except that Plaintiff was unable to complete a hand grip.  The record notes, however, that Plaintiff's pain was "much greater in proportion to objective findings."  Id.

During a March 2001 hospitalization for evaluation of chest pain, it was noted that Plaintiff had minimally decreased right upper extremity strength (-5/5), but secondary to his discomfort.  Tr. 234.  There was no gross sensory or motor deficit. A radiologic study of the right hand was normal.  Tr. 518.  An examination on March 27 showed little evidence of inflammation, and lab studies were normal. Tr. 327.  The impression was "no evidence of systemic inflammatory disease."  Id.

---

[14]  "Heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds."  20 C.F.R. § 404.1567(d).

At a follow-up visit on May 30, 2001, Plaintiff reported experiencing no pain, and engaging in light to moderate exercise daily.  Tr. 241.  He exhibited no gross sensory or motor deficit, Tr. 243, and again his labs were normal, Tr. 323.  The impression was history of polyarthralgias.

On August 28, 2001, Plaintiff told his second consultative examiner, Dr. Samuel Rotimi, that he could write, but his hands got numb.  Tr. 442.  Dr. Rotimi found diminished power in Plaintiff's upper limbs and a diminished sensory perception, but no evidence of muscle wasting.  Tr. 443.  This doctor also found Plaintiff's handgrip "somewhat diminished," and the range of motion in his neck and shoulder "somewhat reduced."   Tr. 443-44.   Radiologic studies were negative. Tr. 444.

The next day, Plaintiff returned to the Rheumatology Clinic with complaints that included shoulder and arm pain.  See Tr. 299-302.  He admitted, however, that the pain "'Comes and Goes.'"  Tr. 300.  Plaintiff complained of difficulty reaching *behind* himself, but not of other reaching.  Tr. 302.  The record notes that Plaintiff had decreased range of motion in his right shoulder.  He also complained of right shoulder pain on his next visit, in October 2001.  See Tr. 293.

Yet outside of this period – largely bracketed by the December 2000 and August 2001 consultative exams – Plaintiff's medical records contain no upper extremity complaints.  When he resumed his doctors' visits in January 2004, Plaintiff had normal range of motion and full strength in all four extremities.  Tr. 494.  During

18

his August 6, 2004, visit, he reported no pain. Tr. 500. Again, it was noted that he had normal range of motion and full strength throughout. Tr. 502. In October 2004, he also reported no pain. Tr. 504.

SSA has a longstanding policy that the weight due an opinion is based, in part, on the extent it is supported by the record.[15] Cf. 20 C.F.R. § 404.1527(d)(4). And SSA provides that the ALJ considers the issues before him de novo: "Therefore, when [ALJs] consider issues of disability, they are not bound by any findings made at the State agency in connection with the initial and reconsidered determinations." "Evaluating Opinion Evidence," 65 Fed. Reg. 11866-02, 11871 (Mar. 7, 2000). SSA further acknowledges that

> [T]he record before the [ALJ] will often include additional evidence beyond what the State agency medical or psychological consultant considered in his or her medical opinion. . . . [T]his factor will be considered when the [ALJ] or Appeals Council weighs medical opinions from a State agency medical or psychological consultant or other acceptable medical source. This may limit the weight that can be given to a medical opinion from a State agency medical or psychological consultant and the period to which the opinion applies.

Id. at 11873.

Plaintiff's case illustrates this principle. Despite the absence of upper extremity complaints in the records, Dr. Wallace found evidence of same, apparently at the very beginning of the occurrence. This episode continued through the date

---

[15] See, e.g., "Standards for Consultative Examinations and Existing Medical Evidence," 56 Fed. Reg. 36932-01, 36936 (Aug. 1, 1991) ("The more consistent a medical opinion is with the record as a whole, the more weight we will give that opinion.").

of the second consultative exam eight months later, but seemingly petered out within a couple more months. The ALJ, in possession of an additional three years of medical records, could recognize the incident for what it was – not an impairment that met the duration requirement[16] but, rather, a one-time event. The ALJ properly considered this evidence, not available to the consultants, to alter the weight afforded their opinions.

3. DVA Disability Determination

The transcript contains a DVA letter, dated April 1, 2002, awarding Plaintiff a "Disability Pension" effective February 1, 2002. Tr. 118. This award was based on Plaintiff's impairments of hypertension, diabetes mellitus, cervical disc disease status post fusion, sleep apnea, and renal calculi.[17] Tr. 119.

Plaintiff recognizes SSA's provision that the disability determinations of other governmental agencies are not binding upon it. See 20 C.F.R. § 404.1504. Yet he urges that "a decision by another governmental agency that a claimant is disabled constitutes evidence that *must* be considered when evaluating a Social Security disability claim," citing 20 C.F.R. Section 404.1512(b)(5). Pl.'s Br. at 7 (emphasis added). This regulatory subsection, in context, provides:

---

[16] "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement." 20 C.F.R. § 404.1509.

[17] The letter states that Plaintiff last worked in 1991, but his SSA records indicate that he had earnings in 1992-96 and 1998-99. See Tr. 104-05.

> (a) *General.*  In general, you have to prove to us that you are blind or disabled.  Therefore, you must bring to our attention everything that shows that you are blind or disabled.  This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis.  We will consider only impairment(s) you say you have or about which we receive evidence.
>
> (b) *What we mean by "evidence."*  Evidence is anything you or anyone else submits to us or that we obtain that relates to your claim.  This includes, but is not limited to:  . . .
>
>     (5) Decisions by any governmental or nongovernmental agency about whether you are disabled or blind[.]

20 C.F.R. § 404.1512.

The court does not read this provision to mandate the ALJ's "consideration" of the DVA award letter, at least not to the extent that such consideration must be articulated in his decision.  That the ALJ was aware of this letter was assured by Plaintiff's counsel, who asked Plaintiff during his hearing if he was already receiving benefits, and from whom.  Tr. 639.  Also, the following exchange occurred at the beginning of the hearing:

> Counsel:  Mr. Hayes has been determined to be disabled by the Veterans Administration or unemployable.
>
> ALJ:      You know their criteria is different and we can have a different decision in both places, I am sure you explained that to him?
>
> Counsel:  I have, Your Honor, the criteria is different, but I believe the Court case said it does it need to be considered by [SSA], albeit as different criteria.
>
> . . .

Counsel:    [I]t is a pension based upon disability.

ALJ:    Okay.  That will be a factor, but sequent to evaluation of the Federal Regulations under disability sections SSDC, SSI and DIB.

Tr. 616-17.

Although not required by the regulations, the circuit courts generally agree that a DVA disability decision should be considered and given *some* weight.  <u>See, e.g.</u>, <u>Pelkey v. Barnhart</u>, 433 F.3d 575, 579 (8th Cir. 2006); <u>Allord v. Barnhart</u>, 455 F.3d 818, 820 (7th Cir. 2006); <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001); <u>Wilkins v. Callahan</u>, 127 F.3d 1260, 1262 (10th Cir. 1997).  Yet it is also recognized that "the criteria applied by the two agencies is different," <u>Chambliss</u>, 269 F.3d at 522, as DVA "requires less proof of disability than [SSA] does."  <u>Allord</u>, 455 F.3d at 820 (comparing <u>Ortiz v. Principi</u>, 274 F.3d 1361, 1364 (Fed. Cir. 2001), with <u>Jones ex rel. Jones v. Chater</u>, 101 F.3d 509, 512 (7th Cir. 1996)).  Thus, "the relative weight to be given this type of evidence will vary depending upon the factual circumstances of each case."  <u>Chambliss</u>, 269 F.3d at 522.

The colloquy recited above shows that the ALJ was aware both of Plaintiff's VA award and of SSA's position on other-agency decisions.  Also, it is clear that the ALJ considered the *basis* of the DVA award, namely "[t]reatment records from VAMC Decatur dated 4-00 to 1-02."  Tr. 119.  These were the only medical records in the

ALJ's possession for that period,[18] and they are cited in his decision. Hence, as held by the Court in Pelkey,

> [T]he ALJ did not err because he fully considered the evidence underlying the VA's final conclusion that Pelkey was 60 percent disabled. . . . [H]ere the ALJ did not ignore the VA rating but considered and discussed the underlying medical evidence contained in the VA's Rating Decision. The ALJ did not err in his consideration of the VA's disability determination.

433 F.3d at 579-80. Further, as discussed above, the ALJ had an additional three years of records upon which to base his final decision. Accordingly, the court finds no basis for remand.

**Conclusion and Recommendation**

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence and the correct legal principles were applied. Therefore, IT IS RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED. To this extent, Plaintiff's motion for summary judgment (Pleading no. 8) seeking a reversal of the Commissioner's decision should be DENIED, Defendant's motion for judgment on the pleadings (Pleading no. 10) should be GRANTED, and this action should be DISMISSED with prejudice.

_WALLM WDM_
_____
WALLACE W. DIXON
United States Magistrate Judge

March 13, 2007

_____

[18] Interestingly, there is a record of only *one* doctor's visit between October 3, 2001, and January 9, 2004, and that one for cold symptoms.